**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Baymont Franchise Systems, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., a Delaware Corporation, | : | Civil Action No. 14- |
| Plaintiff, | : | |
| v. | : | **COMPLAINT** |
| DECATUR HOSPITALITY, INC., a Texas Corporation; CHETAN PATEL, an individual; and HARISH PATEL, an individual, | : | |
| Defendants. | : | |
| | : | |

Plaintiff Baymont Franchise Systems, Inc., by its attorneys, LeClairRyan, complaining of defendants Decatur Hospitality, Inc., Chetan Patel and Harish Patel, says:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Baymont Franchise Systems, Inc. ("BFS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Decatur Hospitality, Inc. ("Decatur"), on information and belief, is a corporation organized and existing under the laws of the State of Texas, with its principal place of business at 1424 Riverside Road, Roanoke, Texas 76262.

3.      Defendant Chetan Patel ("C. Patel"), on information and belief, is a principal of Decatur and a citizen of the State of Texas, residing at 1424 Riverside Road, Roanoke, Texas 76262.

4.      Defendant Harish Patel ("H. Patel"), on information and belief, is a principal of Decatur and a citizen of the State of Texas, residing at 1420 Riverside Road, Roanoke, Texas 76262.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has personal jurisdiction over Decatur by virtue of, among other things, section 17.6.3 of the August 24, 2007 franchise agreement by and between Decatur and BFS (the "Franchise Agreement"), described in more detail below, pursuant to which Decatur has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.      This Court has personal jurisdiction over C. Patel and H. Patel by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which C. Patel and H. Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

8.      Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Decatur of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

<u>The Agreements Between The Parties</u>

9.      On or about August 24, 2007, BFS entered into the Franchise Agreement with Decatur for the operation of a 69-room Baymont® guest lodging facility located at 600 West Hale Avenue, Decatur, Texas 76234, Site No. 22997-72304-01 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as <u>Exhibit A</u>.

10.     Pursuant to section 5 o f the Franchise Agreement, Decatur was obligated to operate a Baymont® guest lodging facility for a twenty-year term.

11.     Pursuant to section 7 and Schedule C of the Franchise Agreement, Decatur was required to make certain periodic payments to BFS for royalties, system assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively "Recurring Fees").

12.     Pursuant to section 7.3 of the Franchise Agreement, Decatur agreed that interest is payable "on any past due amount payable to [BFS] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

13.     Pursuant to section 3.8 of the Franchise Agreement, Decatur was required to prepare and submit monthly reports to BFS disclosing, among other things, the amount of gross room revenue earned by Decatur at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to BFS.

14.     Pursuant to section 3.8 of the Franchise Agreement, Decatur agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise

Agreement, Decatur agreed to allow BFS to examine, audit, and make copies of the entries in these books, records, and accounts.

15.    Pursuant to section 9 of the Franchise Agreement, Decatur could not lease the Facility, nor engage in any change, assignment, transfer, conveyance, or pledge of its interest, except with BFS's prior written consent.  Any attempted transfer, assignment, conveyance, or pledge not in accordance with section 9 of the Franchise Agreement would be void as between BFS and Decatur, and would give BFS the right to terminate the Franchise Agreement.

16.    Pursuant to section 11.2 of the Franchise Agreement, BFS could terminate the Franchise Agreement, with notice to Decatur, if Decatur (a) discontinued operating the Facility as a Baymont® guest lodging establishment and/or (b) lost possession or the right to possession of the Facility.

17.    Pursuant to section 17.4 of the Franchise Agreement, Decatur agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

18.    Effective as of the date of the Franchise Agreement, C. Patel and H. Patel provided BFS with a Guaranty of Decatur's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

19.    Pursuant to the terms of the Guaranty, C. Patel and H. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the [Franchise] Agreement."

20.     Pursuant to the terms of the Guaranty, C. Patel and H. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by BFS in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

### The Termination of the Franchise Agreement

21.     On or around December 31, 2012, Decatur transferred possession of the Facility, without prior consent from BFS, to a third party.

22.     At the time of the transfer, Decatur owed outstanding Recurring Fees to BFS as required under the Franchise Agreement.

### FIRST COUNT

23.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 22 of the Complaint.

24.     Pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Decatur agreed to allow BFS to examine, audit, and make copies of Decatur's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

25.     The calculation of the monetary amounts sought by BFS in this action is based on the gross room revenue information supplied to BFS by Decatur and, to the extent there has been non-reporting, BFS's estimate as to the gross room revenue earned by Decatur.

26.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Decatur.

**WHEREFORE**, BFS demands judgment ordering that Decatur account to BFS for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

27.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 26 of the Complaint.

28.    Pursuant to section 7 and Schedule C of the Franchise Agreement, Decatur was obligated to remit Recurring Fees to BFS.

29.    Despite its obligation to do so, Decatur failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $161,779.64.

30.    Decatur's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Decatur for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $161,779.64, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

31.    BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 30 of the Complaint.

32.    At the time of the termination of the Franchise Agreement, Decatur was obligated to pay BFS Recurring Fees.

33.    Despite its obligation to do so, Decatur failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $161,779.64.

34.     Decatur's failure to compensate BFS constitutes unjust enrichment and has damaged BFS.

**WHEREFORE**, BFS demands judgment against Decatur for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $161,779.64, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

35.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 34 of the Complaint.

36.     Pursuant to the terms of the Guaranty, C. Patel and H. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would immediately make each payment and perform each obligation required of Decatur under the Franchise Agreement.

37.     Despite their obligation to do so, C. Patel and H. Patel have failed to make any payments or perform or cause Decatur to perform each obligation required under the Franchise Agreement.

38.     Pursuant to the Guaranty, C. Patel and H. Patel are liable to BFS for Decatur's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $161,779.64.

**WHEREFORE**, BFS demands judgment against C. Patel and H. Patel for damages in the amount of all Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

**LeClairRyan**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
          Bryan P. Couch

Dated:  4/21/14

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
          Bryan P. Couch

Dated:  4/21/14

# **EXHIBIT A**

Location: **DECATUR, TX**
Entity No. 7̲ ̲2̲3̲0̲4̲
Unit No.: 2̲2̲9̲9̲7̲

## BAYMONT FRANCHISE SYSTEMS, INC.
## FRANCHISE AGREEMENT

    THIS FRANCHISE AGREEMENT ("Agreement"), dated Aug 24 , 200 7 , is between **BAYMONT FRANCHISE SYSTEMS, INC.**, a Delaware corporation ("we", "our" or "us"), and **DECATUR HOSPITALITY, INC.**, a ___TX___ corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1.  License.**  We have the exclusive right to license and franchise to you the distinctive "Baymont System" for providing transient guest lodging services.  We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination.  The License is effective only at the Location and may not be transferred or relocated.  You will call the Facility a BAYMONT Inn & Suites.  You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.  You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2.  Protected Territory.**  We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility in the "Protected Territory", defined in Appendix A, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed.  The Protected Territory fairly represents the Facility's trading area, and you acknowledge that there are no express or implied territorial rights or agreements between the parties except as stated in this Section.

**3.  Your Improvement and Operating Obligations.**  Your obligations to improve, operate and maintain the Facility are:

3.1  **Improvements.**  You will select and acquire the Location and acquire, design, construct, equip and supply the Facility in accordance with Approved Plans, Schedule B and System Standards. You will provide proof of ownership or a ground lease of the Location before or within 30 days after the Effective Date. You will commence construction of the Facility no later than **ten (10) months** after the Effective Date, and complete construction and properly deliver the Certification as

1

described in Section 3.2(b) no later than **twenty-two (22) months** after the Effective Date. Your general contractor or you must carry the insurance required under this Agreement during construction. We may, at our option, terminate this Agreement by written notice to you if you do not meet these deadlines. We may, in our sole discretion, grant extensions of time to perform any phase of the Improvement Obligation. You will pay us an extension fee equal to $67.00 times the number of days of any extension of the deadline for opening the Facility. This Fee will be payable to us after each 30 days of the extension. You will pay us any extension fee outstanding when the Facility opens 10 days after the Opening Date. The Initial Fee described in Section 6 is not refundable. Construction commences, for purposes of this Section, when all of the following occur: (x) We approve a site plan, completed working drawings and detail specifications for the Facility; (y) Governmental permits are issued to commence foundation construction; and (z) You commence pouring concrete for building footings.

3.2 **Improvement Plans.** (a) Your architect and you will create construction documents (including a project manual and working drawings) for the Facility based upon the System Standards and this Agreement (particularly Schedule B), and then submit them for our approval before starting improvement of the Location. We may, upon your request and subject to availability, provide your designated architect with a set of "Prototype Plans" for a Chain Facility which your architect can use for creating the construction documents. To receive the Prototype Plans, your architect must sign and return to us the Prototype Plans Agreement attached as Schedule D. Your architect must certify to us and to you that the Facility's plans and specifications comply with the design requirements of the Americans with Disabilities Act ("ADA"), the Department of Justice Standards for Accessible Design ("ADAAG") under that Act, and all codes that apply using the form of certificate in Schedule D. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and construction of your Facility. Our review does not cover technical, architectural or engineering factors relating to the Location, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible. You must allow for 10 days of our review each time you submit Plans to us. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our visitation to the Facility before, during or after construction or any subsequent renovation. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may visit the Facility and observe the work while in progress without prior notice. We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards. We may terminate this Agreement if you fail to comply with any such direction. We may offer other architectural and design services for the Facility and charge you a fee for them.

(b) Before we authorize you to open the Facility, you must complete and submit the Certification of ADA Compliance in the form attached to Schedule D (the "Certification"). You must complete the Certification per its instructions and submit it to us only after it has been signed by your general contractor, your architect of record or a consulting architect you hire for the Certification. If you cannot obtain the signature of the contractor or such an architect for the Certification, you must sign

2

the Franchisee's Certification of Compliance on the signature page of the Certification. The Certification contains a checklist of ADA related matters that you must address in developing and completing the Facility. If we determine that the Certification has not been properly completed, or if we have actual knowledge (not constructive or implied knowledge) that the signatures on the Certification are false or fraudulent, we will return the Certification to you with written notice that we will not permit you to open the Facility for business under the System until we receive a properly completed Certification. We may terminate this Agreement under Section 3.1 or Section 11 if you do not submit the Certification properly completed before you open the Facility under the System, you fail to meet the deadline for completing the Facility specified in Section 3.1 because you do not submit a properly completed Certification, or if you submit a false or fraudulent Certification. We will delay the Opening Date until you submit the properly completed Certification. We shall not be liable to you or any third party if the Certification is improperly completed or the Facility is not built or operated in compliance with ADA.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval, or as permitted under and strictly in accordance with the System Standards Manual. You may not open the Facility until it passes our completion inspection, at which we determine that the Facility as built meets our Standards, and we receive from you and your architect or contractor the certification in the form attached to Schedule D stating that the Facility as built conforms to the Approved Plans and the design requirements of ADA, ADAAG and all applicable codes. If the Facility fails the inspection you designate as the completion inspection and does not meet our Standards and conform to the Approved Plans, then you must reimburse us for the actual, reasonable costs (travel, lodging, meals) of every additional inspection we perform before the Opening Date, including the inspection that results in authorizing the Facility's opening.]

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual and follow standard industry practices for safeguarding cardholder information, including but not limited to, the Payment Card Industry Data Security Standard. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool (if any) and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. Unless System Standards permit otherwise, you will not charge guests for local telephone calls made from guest room telephones or charge guests any access fee or surcharge on long distance telephone calls made from guest room telephones. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is material.

3

3.5  **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees or general managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, tuition and other reasonable charges we may impose for training under Section 4.1.  If training is provided at the Facility, you will provide lodging for our representative and rent any equipment and facilities we need.

3.6  **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising.  Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1  You will participate in any frequent guest rewards program we determine is appropriate and pay the Special Marketing Assessment associated with the program.

3.6.2  You must participate in any regional marketing, training or management alliance or cooperative of Chain Lodging franchisees formed to serve the Chain Facilities in your area.  We may assist the cooperative collect contributions.  You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.3  The Facility must participate in our Internet marketing activities for Chain Facilities like other marketing programs.  You shall provide us with information and photographs of the Facility in accordance with System Standards for posting on the Chain website.  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  You will discontinue any Internet marketing that conflicts, in our reasonable discretion, with the Chain's Internet marketing activities.  You must honor the terms of any participation agreement you sign for Internet marketing.  You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory for Chain Facilities, provided that the activities carry aggregate fees of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for Chain Facilities for the preceding calendar year.  We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

4

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

### 3.8 Financial Books & Records; Audits.

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Lodging Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards. We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees, any Audit Fee we assess you for your default of Section 3.8 as described in Section 4.8 and/or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified

BAYEXC1
216634 03/07

Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Section 3.1. We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Baymont Franchise Systems, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, their current and former affiliates, successors and assigns as additional insureds.

3.11 **Conferences.** You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain Lodging franchisees, if and when we determine to hold an annual Chain conference. Mandatory recurrent training for franchisees and managers described in Section 4.1.4 may be held at a conference. The fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain Lodging conference. You will be charged the fee for each Chain Lodging conference held after the Effective Date of this Agreement.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Baymont" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in guest service and satisfaction guaranty programs we require in good faith for

6

all Chain Facilities.  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14   **Facility Modifications.**   You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add once the Facility has 200 rooms.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15   **Courtesy Lodging.**   You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16   **Material Renovations.**   Beginning five years after the Opening Date, we may issue a "Material Renovation Notice" to you that will specify a Material Renovation for the Facility, to be commenced no sooner than 90 days after the notice is issued.  You will perform the Material Renovations as the Material Renovation Notice requires in a time period of 120 days or by the date specified in the Material Renovation Notice, whichever is longer.  We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice.

3.17   **Technology Standards & Communications.**   You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment.  We may modify System Standards to require new technology at all Chain Facilities.

3.17.1 At our request, you shall participate in any intranet or extranet system developed for use in connection with the System.  Such intranet or extranet system may be combined with that of our affiliates.  You shall also sign such terms of use agreements concerning the use of such intranet or extranet system as we may prescribe, which agreements may contain, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system.  You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

4.   <u>**Our Operating and Service Obligations.**</u>   We will provide you with the following services and assistance:

7

4.1 **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, remedial training and supplemental training.

4.1.1 **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may also offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 45 days after the Opening Date. Any replacement general manager must complete general manager orientation to our satisfaction within 45 days after he/she assumes the position. If we do not offer a place in general manager orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for general manager orientation which is payable before the scheduled date of the program. The tuition for your first general manager is $1,250 if he/she attends orientation within the time period required under this section. For any replacement general manager, you must pay the tuition in effect for the program when your manager attends the program. You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits. We may, at our option, automatically schedule your initial or replacement general manager for a class to be held within the required time period (an "auto-assigned class") and invoice you when we notify you about the date of the class. If your general manager is unable to attend that class, you must notify us at least 15 days before the training start date and re-schedule the general manager for another class to be held within the 45 day period. We may charge you "No-Show Fees" or "Cancellation Fees" if your general manager fails to attend orientation within the required time period or fails to attend a program we have scheduled for him or her without giving us at least 15 days notice of cancellation. This is in addition to the tuition you must pay us for your general manager at the then current rate when he/she attends orientation. See Section 4.1.5.

4.1.2 **Owner Orientation Training.** We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services. If this is your first System franchise, you (or a person with executive authority if you are an entity) must attend owner orientation preferably within 60 days before, but no later than 60 days after, the Opening Date. If we do not offer a place in owner orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. We charge you tuition of $825 which is payable before the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least 15 days before the start date and schedule attendance at another class to be held within the 60 day period. We may charge you No-Show or Cancellation Fees if you fail to attend any mandatory orientation program within the required time period or fail to attend a program we have scheduled for you without giving us at least 15 days notice of cancellation. See Section 4.1.5.

8

4.1.3 **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. Tuition for remedial training must be paid before the training commences. The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.4 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge. This training could be offered in our U.S. training center or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5 **No- Show and Cancellation Fees.** If you or your general manager fails to attend orientation within the required time period, or fails to attend a training program as scheduled (including any auto-assigned class) without notifying us in advance, we may charge you a No-Show Fee of up to 100% of the tuition for the program. If you or any member of your staff cancels participation in any training program less than 15 days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Basic Reservation Fee included in the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. All information collected or captured by and through the Reservation System, regardless of who enters the information, shall become our sole property.

4.3 **Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any)

9

BAYEXC1
216634 03/07

among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from System Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We will publish the Chain Directory.  We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication.  We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements.  We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4  **Purchasing.**  We may offer optional assistance to you with purchasing items or services used at or in the Facility.  Our affiliates may offer this service on our behalf.  We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts.  We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards. We may offer optional architectural and design services for the Facility for a separate fee.  We or our affiliates may earn a profit from providing purchasing and procurement services, including receipt of fees from third party suppliers.

4.5  **The System.**  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions.  We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6  **Consultations and Standards Compliance.**  We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain Facility franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7  **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications.  We will lend you one copy

10



representatives. We will offer you access to any Internet website we may maintain to provide Chain Facility franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

**4.7 System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

**4.8 Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $1,000.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs, but not more than 5% per year on a cumulative basis. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6. Application and Initial Fees .** You will pay us an Application Fee of $1,000 when you submit your Application. The Application Fee is not refundable. You will pay us an Initial Fee equal to $25,000 when you sign this Agreement which shall be due and payable as follows: $26,000.00 will be transferred from site #19226-69500-01.

**7. Monthly Fees, Taxes and Interest.**

7.1   You will pay us certain Recurring Fees each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) 10 days after the month in which they accrue, without billing or demand. These fees include the following:

7.1.1   A "Royalty" equal to (i) 4% for the first License Year, (ii) 4.5% for the second License Year, and (iii) 5% for every subsequent License Year, of Gross Room Revenues of the Facility accruing during the calendar month, to compensate us for granting you the License and the opportunity to use the System, accrues from the earlier of the Opening Date or the date you begin operating the Facility under a Mark without our consent.

7.1.2   "Marketing Fees", including "System Assessment Fees" as stated in Schedule C for advertising, public relations, marketing, training, reservation and other related services and programs, accrues from the Opening Date until the end of the Term, including during periods when reservation service is suspended. After consultation with the official advisory board or committee, if any, and upon 30 days written notice, we may change the System Assessment Fees for all Chain Facilities to cover changes in costs (including reasonable direct and indirect overhead costs) related to such services and programs or to provide for additional services or programs. We may earn a

reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks, and fees for additional services and programs based on participation and delivery of reservations. We may charge Chain Facilities using the System outside the United States for reservation service using a different formula. We may increase or adjust the Marketing Fees, in the future on not less than 60 days prior written notice, provided that you will not be required to pay more than 6% of Gross Room Revenues for the System Assessment Fees.

7.1.3   A "Special Marketing Assessment" as stated in Schedule C for a frequent guest rewards program that we may create or undertake and require participation by all Chain Facilities.

7.2   You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3   "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4   If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8. Indemnifications.

8.1   Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2   You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense

of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3   We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

### 9.   Your Assignments, Transfers and Conveyances.

9.1   **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-Termination obligations in Part 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2   **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3   **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Part 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must

13

first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may require structural changes to the Facility if it no longer meets System Standards for entering facilities, or, in the alternative, condition our approval of the Transfer on one or more of the following:  limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your Owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

**9.4  Permitted Transferee Transactions.**  You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5  Attempted Transfers.**  Any transaction requiring our consent under this Part 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6  Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your Owner(s) at our request.

14

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement, but we are responsible for the performance of all of our obligations to you under this Agreement. We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

## 11. Default and Termination.

**11.1 Default.** In addition to the matters identified in Section 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

**11.2 Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1, (2) you discontinue operating the Facility as a Chain Facility, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing

15

process is completed, (11) you or any of your Owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

### 11.3 Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4  **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement including the failure to observe Technology Standards, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Marketing Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. If you default under this Agreement because the Facility fails to meet System Standards, including without limitation failing a quality assurance inspection, we may, at our option and in our sole discretion, require as a condition to your cure of the default that you engage a hotel management company acceptable to us to operate the Facility for a period of at least two years, or longer in our discretion. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive

and other relief. We may litigate to collect amounts past due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we do not issue our approval or consent as and when required under this Agreement, within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent. To the extent permitted by applicable law, this action to compel us to issue our approval or consent shall be your exclusive remedy; and we shall not be liable to you for direct, indirect, special, consequential or exemplary damages, including but not limited to lost profits or revenues.

## 12. Liquidated Damages.

12.1 **Generally.** If an Involuntary Termination occurs, except as a result of your default under Section 3.1, you will pay us Liquidated Damages within 30 days following the date of termination. Liquidated Damages depends on the length of the Term expired and the Facility's Occupancy Rate for the one year period (the "Measurement Period") ending on the last day of the month preceding the effective date of the Involuntary Termination.

12.1.1 I f the effective date of the Involuntary Termination occurs (a) before the end of the third License Year, or (b) after the end of the third License Year and (i) before the Ending Period defined below, and (ii) we are unable to verify your Occupancy Rate as provided below, then you will pay us $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended.

12.1.2 I f the effective date of the Involuntary Termination occurs after the end of the third License Year, if we are able to verify your Occupancy Rate either through an audit we perform at your expense or by submitting to us within 10 days after the effective date of Involuntary Termination books and records you maintained as required under Section 3.8 and System Standards certified under oath by your chief executive or accounting officers as accurate, then you will pay as Liquidated Damages (1) nothing if the Occupancy Rate was less than 50% during the Measurement Period and you were in full compliance with all of your obligations under this Agreement during the Measurement Period; or (2) the greater of two times the sum of accrued Royalties and System Assessment Fees for the Measurement Period or $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended, if the Occupancy Rate was 50% or more during the Measurement Period or if you were in default of any obligation under this Agreement during the Measurement Period.

12.1.3 I f the Involuntary Termination occurs during the final two License Years (the "Ending Period"), Liquidated Damages that would be payable under clause 2 of the preceding sentence, or the next preceding sentence, will be limited to the average monthly Royalties and System Assessment Fees during the Measurement Period multiplied by the number of months remaining in the Term.

12.1.4 The Occupancy Rate for a period equals the number of guest rooms sold and provided on a complimentary basis divided by the number of guest rooms available for rental to guests. Liquidated Damages are paid in place of our claims for lost future Royalties and System Assessment Fees under this Agreement. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us Royalties and System Assessment Fees for a period of one year (the "Notice Period") after we receive the initial notice of condemnation described in Section 11.3, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the Notice Period if the Condemnation is completed before the Notice Period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the Notice Period expires, but Recurring Fees must be paid when due until Condemnation is completed.

**13.    Your Duties At and After Termination.**   When a Termination occurs for any reason whatsoever:

13.1 **System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2 **Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a Chain Facility, including the Marketing Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We

18

shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3 **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4 **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.** <u>**Your Representations and Warranties**</u>. You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your Owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Schedule B accurately reflects your ownership. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your Owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your Owners and your finances that we request in the Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or are, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of Treasury's Office of Foreign Assets Control, or otherwise.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your Owners, any guarantor, or the finances of any such person or entity,

BAYEXCI
216634 03/07

was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

### 15.  Proprietary Rights.

15.1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  You acknowledge that System Standards include non-functional trade dress that is an integral part of the System and you covenant that you will not, directly or indirectly through an affiliate, use the trade dress in any structure that is not a Chain Facility. No good will shall attach to any secondary designator that you use.

15.3  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or franchisee), provide services to or joint venture (i) distinctive separate lodging, or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4  **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request),

20

you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6 **Prior User.** If you are unable to name the Facility with the mark because a pre-existing user has senior rights in your hotel trading area, then your sole and exclusive remedy against us will be to terminate this Agreement and receive a refund of the Initial Fee and the Royalties paid prior to termination. You must give us 15 days prior written notice of termination in that circumstance.

15.7 **The Internet.** You may use the Internet to market the Facility subject to this Agreement and System Standards. You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent. You will assign to us any such identification at our request without compensation or consideration. You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties. You must participate in the Chain's best available rate on the Internet guarantee or successor program. The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not

21

limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

BAYMONT FRANCHISE SYSTEMS, INC.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. 1-800-643-2107

Your name: Decatur Hospitality, Inc.
Your address: 1424 Riverside Drive, Roanoke, TX 76262
Attention: Harish Patel
Your fax No.: 8001-665-4061.

22

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4 **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5 Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action. You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

17.7 **Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1 **You received our UFOC for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us. You have**

received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

**17.7.2** Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

**17.7.3** This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

**17.7.4** You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 20 of the UFOC or in a writing that is attached to this Agreement.

**17.7.5** You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

17.8   Force Majeure.   Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

**18.**   Special Stipulations.   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1   Reduced Relicense Fee.   If (i) you are not then in default under this Agreement, and (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, then the Relicense Fee for a Transfer will be $5,000.00  if we receive the proposed transferee's Franchise Application before the end of the first License Year, and $10,000.00 if we receive the proposed transferee's Franchise Application after the first License

24

Year and before the end of the fifth License Year. If the conditions are not satisfied, and after the fifth License Year, the Relicense Fee will be as specified in Section 7.4.

**18.2  Transfer Rights.** If you are then not in default under this Agreement, at any time before the end of the first License Year, you may assign this Agreement at the same time as you convey the Facility to an entity in which you or the persons listed on Schedule B as the original owners of your Equity Interests are to be owners of at least 51% of the Equity Interests of the entity and retain control over the entity so that change of control, as defined in an Equity Transfer (Appendix A) does not occur. The transferee and you must sign and deliver to us the Assignment and Assumption Agreement in the form attached as an exhibit to this Agreement before you transfer the Facility. No Application or Relicense Fees will be charged. The accounts of the transferee and you must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit (i) an application on our standard form, (ii) its organizational agreement or charter, (iii) updated insurance, and (iv) an updated Guaranty with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us. The transferee must send us a copy of the warranty deed conveying the Facility within 30 days after its delivery.

**18.3  Family Transfer.** You may permit your Equity Interests to be transferred between an individual and the person's spouse, adult offspring, siblings or trusts, the sole beneficiary of which are such family members. Any such transaction will be subject to the procedures in Section 9 for Permitted Transferee transactions, whether or not the transfer is for consideration or a gift. No such transaction shall release any guarantor of your obligations from liability under the Guaranty.

**18.4  Alternate Location Selection.** You may choose an alternate site for construction of the Facility at your option. An application for changing the Location to the new site must be submitted to and approved by us before you commence construction of the Facility. Our approval shall be subject to any notification procedures we establish for the benefit of current and prospective Chain licensees, and any contractual obligations to which we believe we are bound. An application for the new site together with its legal description must be submitted to us for approval within **six (6)** months after the Effective Date, after which this stipulation shall be void. The time schedule in Section 3.1 will not be affected by your exercise of this option. Upon our written approval, the new site will become the Location, and its legal description will become Schedule A.

**18.5    Baymont New Construction Incentive Program.**

18.5.1 You will be eligible to participate in our Baymont New Construction Incentive Program if (i) you sign and deliver this Agreement with the Initial Fee by December 31, 2007, (ii) you and your guarantors sign and return to us a Development Incentive Note with your signed Franchise Agreement, and (iii) you complete construction and open the Facility in compliance with the Approved Plans and System Standards **with a minimum of 50 rooms** within 18 months of the Effective Date. The amount of the Development Incentive will be based on the number of guest rooms at the Facility as built at the Opening Date, subject to certain limitations. The amount of the Development Incentive will be **$69,000.00**, based on the number of guest rooms specified on Schedule B. If the number of guest rooms changes with our consent, we will adjust the amount of the Incentive based on the formula of $1,000 for each guest room, up to a maximum of $100,000, but not more than 50% of your equity investment in the Facility. **In addition, if the number of guest rooms changes with our consent, we will adjust the amount of the Incentive based on the formula of reducing the Development Incentive by $1,000 for each**

23

**guest room less than 69 guest rooms in the Facility at opening.** You authorize us to modify the principal amount of the Development Incentive Note based on this Section and the number of guest rooms at the Facility.

18.5.2  The Incentive will be disbursed after (i) you have passed a final credit/financial review with no material adverse changes in the business, legal, litigation, bankruptcy status or finances of the applicant or the guarantors or the financial viability of the Facility since preliminary approval, (ii) the Facility officially opens with our consent, (iii) you have completed all required pre-opening improvements specified in this Agreement; and (iv) you have paid the Initial Fee. The Development Incentive is a loan that is not subject to repayment unless the License terminates before the end of the first 15 years of operation of the Facility or a Transfer occurs. If that happens, you will repay the balance of the Incentive. At each anniversary, the Development Incentive reduces by 1/15th of the original amount. You must also submit the franchisee and good standing certificates attached to this Agreement if we request them. The Development Incentive Note bears no interest except in the case of default. Your principal owners must co-sign the Note with you. If your principals are residents of community property or certain other states, their spouses must also co-sign the Note. If you engage in or suffer a Transfer, you must repay the balance of the Development Incentive Note unless the transferee and its principals assume the obligation to repay the Incentive and provide us with such other security as we may require in our sole discretion.  We reserve the right to conduct a credit investigation of the applicant and its owners at all times and withdraw the offer of the Incentive before we issue or disburse the Incentive.

18.5.3  If you qualify and receive the Development Incentive, you will pay a special monthly "Combined Fee" consisting of the Royalty and System Assessment Fees (excluding agent and property to property commissions, Internet fees, Special Assessment Fees, affinity program fees, service fees and charges, guest complaint assessments, GDS Fees and other fees and charges included in Schedule C), to us at the following rates:  7.5% of Gross Room Revenues for the first License Year and 8.5% of Gross Room Revenues for the second License Year.  The monthly Royalty and System Assessment Fees set forth in Section 7.1 apply after the second License Year, and if you default under this Agreement and fail to cure the default within the time permitted under this Agreement or the default notice, whichever is longer, during the first two License Years.

18.6    **Supplemental Development Incentive.**  You will be eligible to receive a Supplemental Development Incentive ("SDI") if (i) you satisfy all the conditions of Section 18.5; (ii) you and your guarantors sign and return to us the Supplemental Development Incentive Note; (iii) you are not in default under this Agreement ; and (iv) the following Baymont properties are opened and operating in compliance with System Standards:  Wheeler, TX (Unit #19977), Snyder, TX (Unit #23017), Perryton, TX (Unit #19218) and Stanton, TX (Unit #23016).  The amount of the SDI will be in the amount of Thirty Thousand Dollars ($30,000.00).

18.6.1  The SDI will be distributed after you have satisfied the conditions of 18.5 provided (i) you have passed a final credit/financial review with no material adverse changes in the business, legal, litigation, bankruptcy status or finances of the applicant or the guarantors or the financial viability of the Facility since preliminary approval, and (ii) the Facility are open and operating with our consent according to the deadlines established in Section 3.1.  The SDI is a loan that is not subject to repayment unless the License for the Unit or this Agreement terminates before the end of the License Term or a Transfer occurs.  If that happens, you will repay the balance of the SDI.  At each anniversary, the SDI reduces by one-fifteenth of the original amount.  You must also submit the

24

franchise and good standing certificates attached to this Agreement if we request them. The SDI bears no interest except in the case of default. Your principal owners must co-sign a SDI Note with you at the time of disbursement. If your principals are residents or community property or certain other states, their spouses must also co-sign the Note. If you engage in or suffer a Transfer, you must repay the balance of the SDI Note unless the transferee and its principals assume the obligation to repay the SDI and provide us with such other security as we may require in our sole discretion. We reserve the right to conduct a credit investigation of the applicant and its owners at all times and withdraw the offer of the Incentive before we issue or disburse the SDI.

**remainder of page intentionally left blank**

BMTEXCI
216634 03/07



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**BAYMONT FRANCHISE SYSTEMS, INC.**

By: _____
     Vice President

**YOU, as Franchisee:**
**DECATUR HOSPITALITY, INC.**

By: _____
     **(Vice) President**

26

# APPENDIX A

## DEFINITIONS

ADA means the Americans with Disabilities Act, as amended, 42 U.S.C. 12101 et seq., and the related Federal regulations, as amended, including the Accessibility Guidelines and Standards for Accessible Design, 28 C.F.R. Part 36, Appendix A.

Additional Fees means the fees charged under Section 7.1.2 other than the System Assessment Fee.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Part 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Part 3.

Approved Supplier means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a transient lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

27

BAYEXC1
216634 03/07

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Elective Termination means termination of the License by valid exercise of the rights under Section 11.3, or your termination of this Agreement or the License if we materially default under this Agreement and fail to cure within a reasonable time after we receive written notice from you specifying the default in detail.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those Owners disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties constructed at the Location, as modified with our consent.

28

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

<u>Gross Room Revenues</u> means gross receipts attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, and the net proceeds of use and occupancy and business interruption, rent loss or similar insurance, to the extent such insurance proceeds are actually received, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

<u>Improvement Obligation</u> means your obligation to construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Part 3.

<u>Incentive Advance</u> means the amount advanced to you after the Opening Date under Section 6.2, if any.

<u>Indemnitees</u> means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

<u>Initial Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6.1.

<u>Involuntary Termination</u> means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement except under Section 18.5.2.

<u>License</u> means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Part 1.

<u>License Year</u> means:

(i) *If the Opening Date occurs on the first day of a month:* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

29

Liquidated Damages means the amounts payable under Part 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at intersection US-81 & W. Hale Avenue, Decatur, TX 76234, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities, including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the names, designs and logos for "BAYMONT" U.S. Reg. No. 2,258,085; "BAYMONT    INN", U.S. Reg. No.2,286,567; BAYMONT INN & Design, U.S. Reg. Nos. 2,307,473; 2,354,792; 2,383,033; "BAYMONT INN & SUITES" U.S. Reg. No. 2,713,336; BAYMONT INN & SUITES & Design, U.S. Reg. Nos. 2,399,770; 2,354,791; 2,309,146; and other marks; and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marketing Fees means the System Assessment Fee and the Additional Fees charged under Section 7.1.2 and Schedule C, and the special Marketing Assessment, if any.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Material Renovation means the upgrading, updating, modifications, replacements, additions, repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Material Renovation Notice means the written notice from us to you specifying the Material Renovation to be performed and the dates for commencement and completion given under Section 3.16.

30

BAYEXCI
216634 03/07

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Owners means the persons identified on Schedule B as the owners of your Equity Interests.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an Owner any or all of the Owner's Equity Interests upon the death of the Owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades, updates, improvements, repairs, repainting, refurbishing and replacements we prepare and require as part of the initial Improvement or Transfer process.

**Protected Territory means all the area within a circle created by a five (5) mile radius whose centerpoint is the intersection of US-81 & W. Hale Avenue, Decatur, TX (Latitude 33.2280°N and Longitude 97.5933°W).**

Prototype Plans means the prototype documents reflecting the overall design intent, FF&E, and color schemes for a Chain Facility, that we deliver to you after the Effective Date. The Prototype Plans are not appropriate for a specific Facility.

Recurring Fees means the Royalties and Marketing Fees as stated in Part 7.

Reinspection Fee means the fee you must pay to us under Section 3.9 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Relicense Fee means the fee your transferee or you pay to us under Part 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

31

BAYEXC1
216634 03/07

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

Special Marketing Assessment means the fee you pay us under Section 7.1.3 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following:  (a) the Marks; (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fees means the fees charged under Section 7.1.2 and Schedule C for the Chain's marketing, advertising, public relations, Reservation System, training and other services.

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, Internet access, in-room and public area technology, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means an Elective Termination or an Involuntary Termination.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part

of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Baymont Franchise Systems, Inc., a Delaware corporation, its successors and assigns.

BAYEXC1
216634 03/07

## SCHEDULE A

(Legal Description of Facility)

34

BAYEXC1
216634  03/07

## SCHEDULE B

### PART I: YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| **Chetan Parikh** | **50%** | **common stock** | |
| **Harish Patel** | **50%** | **common stock** | |

### PART II: THE BAYMONT FACILITY:

Total number of approved guest rooms: **69**

Number of standard guest rooms:  49

Number of approved suites: 20

Parking facilities (number of spaces, description): **at least 69**

Other Amenities, services and facilities, subject to changes required by System Standards:

> **Meeting Room** with minimum 266 square feet;

> **Business Center** with wireless Internet access, workstation including personal computer and printer

> **Exercise Room** with machines required by System Standards;

> **Swimming Pool (optional)**

> Electronic lobby and guest room access doors

> Free to guest wired high speed Internet access service and data port telephones in all guest rooms

> Guest room voice mail

> Complimentary continental breakfast

_Initial_

35

**BAYMONT FRANCHISE SYSTEMS, INC.**
**SCHEDULE C**

**January 2007**

A.    System Assessment Fees

The System Assessment Fees consist of the "Marketing Contribution" and the "Basic Reservation Fee." The Marketing Contribution is 1.5% of Gross Room Revenues; the Basic Reservation Fee is 2.0% of Gross Room Revenues. We reserve the right to increase or modify the System Assessment Fees (subject to the limit imposed under Section 7.1.2) and any other Additional Fee and to add other Additional Fees as charges for new services, in our sole discretion as to amount or formula from time to time but with at least 30 days prior written notice, to reflect changes in the fully allocated costs of providing Reservation System services, to add, drop or modify the types of reservation and marketing services offered, and to provide the funds reasonably necessary or appropriate for the Chain's marketing, public relations and training programs.

B.    Additional Fees - GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS") or the Internet for your Facility. The GDS Fee described in Section 7 is $5.15 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet originated reservations carry fees of $4.15 per reservation booked through sources other than GDS powered websites, our Chain website, or our direct connection to expedia.com or hotels.com. We do not charge any fees for reservations booked through our Chain website or through our direct connection to expedia.com or hotels.com. GDS and Internet-originated reservations also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

C.    Additional Fees – Other Marketing and Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .5% of commissionable revenue. Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs. The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission. The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.

36

BAYEXC1
216634 03/07

By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf or for Chain Facilities to participate in their programs.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. Beginning May 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and System Assessment Fees in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

We or an affiliate may charge you a commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

D.    Special Assessment Fee

We charge a Special Assessment Fee for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program

37

currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Special Assessment Fee is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

E.      Guest Services Assessment

        We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 2 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

BAYEXC1
216634 03/07

# EXHIBIT B

## GUARANTY

To induce Baymont Franchise Systems, Inc. its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and the Incentive Advance Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Guarantors:

_____
Chetan Patel

_____
Harish Patel

39

BAYEXC1
216634  03/07